JACKSON-WERMICH TRUST, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32307. Promulgated September 24, 1931.

*J. D. Peeler, Esq.*, for the petitioner.
*Arthur Carnduff, Esq.*, for the respondent.

154

”.

158

### OPINION.

MORRIS: The principal question for consideration is whether the petitioner is an " association " within the meaning of section 2 of the Revenue Act of 1921 and, therefore, taxable as a corporation under section 230 of said act, or whether it is an ordinary common law trust, as it contends.

Section 704 of the Revenue Act of 1928 is inapplicable, for the reason that the petitioner did not file a return as a trust, but filed an ordinary " Corporation Income Tax Return " on Form 1120 for the period in question. See *Russell Tyson et al., infra.*

The respondent relies upon *Hecht.* v. *Malley*, 265 U. S. 144; *Lansdowne Realty Trust et al.*, 20 B. T. A. 119; and *Russell Tyson et al.*, 20 B. T. A. 597. It is proper to state at the outset that we consider those cases clearly distinguishable upon all of the vital fact elements involved.

In *Hecht* v. *Malley, supra*, the Supreme Court adopted the following definitions of the word " association ":

\* \* \* It has been defined as a term "used throughout the United States to signify a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise." [Citations.] "In the United States, as distinguished from a corporation, a body of persons organized, for the prosecution of some purpose, without a charter, but having the general form and mode of procedure of a corporation." Webst. New Internat. Dict. "[U. S.] An organized but unchartered body analogous to but distinguished from a corporation." \* \* \*

And, concluding that the petitioners were " not merely trustees for collecting funds and paying them over," but were " associated together in much the same manner as the directors in a corporation for the purpose of carrying on business enterprises," it held that they were " to be deemed associations within the meaning of the Act."

In the *Lansdowne* case, *supra*, which was reversed on appeal, 50 Fed. (2d) 56, the Board held that the trust was not "merely passively holding property and collecting income therefrom," but "It was engaged in maintaining and renting a building which it owned,

being thus similar to the Hecht Real Estate Trust," and held that it was taxable as an association.

In *Russell Tyson et al.*, *supra*, the Board, upon the evidence adduced, held that the petitioner was an association, and in doing so directed attention to the similarity between that case and the *Lansdowne* case.

Respecting the distinctions referred to by the respondent in *Wilson Syndicate Trust*, 14 B. T. A. 508; affd., 39 Fed. (2d) 43, we find that he urged the same point in *Dauphin Deposit Trust Co.*, *Trustee*, 21 B. T. A. 1214, and our views in the matter are there set forth as follows:

The Commissioner, however, urges the inapplicability of the foregoing case because of the statements of the court that:

" * * * A distinction is to be made between an agreement between individuals in the form of a trust and an express trust created by an ancestor, although they may have some features in common. The controlling distinction is that one is a voluntary association of individuals for convenience and profit, the other a method of equitably distributing a legacy or donation. Congress has recognized this distinction, classing the former as associations, to be taxed as corporations, and at the same time providing for a separate and distinct method of taxing the income of estates and trusts created by will or deed, classing them together for that purpose. * * * "

But we do not understand the court to lay down the rule that all express trusts created by an ancestor are to be treated as trusts and not as associations and all agreements between individuals in the forms of trusts are to be considered as associations. In general, we think it is true that the circumstances surrounding the creation of a given trust are strong evidence as to its purpose, but of more importance is whether the trust is carrying on business for profit, or whether it is merely in existence for the distribution of property, and we think the court recognized this fact in the statements quoted above. * * *

We deduce, therefore, from the foregoing and other cases bearing upon this question, that the really significant tests for determining whether an alleged trust is to be treated as an association for tax purposes or not are whether the certificate holders have voluntarily associated themselves together in " the general form and mode of procedure of a corporation " and are organized to and in fact are engaged in the active conduct of a business for profit, or whether the trustees are merely holding the property and collecting the income therefrom and distributing it to those beneficially interested. *Hecht* v. *Malley*, *supra; White* v. *Hornblower*, 27 Fed. (2d) 777; *E. A. Landreth Co. et al.*, 11 B. T. A. 1; *Dauphin Deposit Trust Co.*, *Trustee*, *supra;* and *Lloyd M. Willis et al.*, 22 B. T. A. 564.

As to what may be termed the purely formal test, that is, whether the trust enjoys the same form and manner of organization as a corporation, it must be said that the petitioner here does not. In the

first place, while the name of an enterprise is of little or no importance, it may, and probably should, be considered as one of the elements bearing upon its implied relationship with the public. If an unincorporated body uses a name commonly employed only by those incorporated, the reasonable inference may be, and usually is, that it is incorporated, and consequently it will be dealt with by the public as though it were a corporation. On the other hand, if the term " trust " is ( iployed, as here, the public is put upon notice; consequently, there can be no possible misunderstanding. Cf. *E. A. Landreth*, *supra*, where the corporate name there used was commented upon as an element of consideration.

The petitioner here was unchartered, and was organized under no State statute, but was created by a trust indenture under the general trust laws of the State, as in *Wilson Syndicate Trust*, *supra*, where the petitioner was held to be a trust and not an association. The trust had no officers such as are common to corporations, nor did it have any body of officials even resembling a board of directors. It was conducted by trustees, so designated in the declaration of trust, who were self appointed by reason of the fact that they were the creators of the trust. The trustees, according to the declaration of trust, were required to serve without compensation and they were unrestricted as to their terms of office. Upon the resignation of either trustee he himself was empowered to select and appoint his own successor, and in case of the death of a trustee or the resignation thereof without the appointment of a successor the surviving trustee was vested with such authority. In no case, therefore, did interest holders have any power whatsoever over the appointment or selection of trustees, except where both should expire at the same time, in which event both of the trustees would be appointed by not less than 30 per cent of the beneficial interests under the trust. Cf. *Extension Oil Co.*, 16 B. T. A. 1028; affd., 47 Fed. (2d) 65. And in this particular the trust theory is eminently stronger here than in *Wilson Syndicate Trust*, *supra*, for there the trustees could be removed by the interest holders.

Nor does it appear that the certificate holders had any control whatsoever over the management and operation of the trust, a factor which, while not determinative of the issue, is important and should be considered. *Lloyd M. Willis et al.*, *supra*, and *E. A. Landreth*, *supra*.

The trust employed no seal, it had no by-laws, and it held no official meetings. In fact it does not appear that any meetings were ever held except, of course, as business was discussed between the two trustees upon informal meeting.

It has been urged that there was indirect control over the trustees by the beneficial interests through their right to amend or modify the declaration of trust, but it must be borne in mind that such an amendment or modification was possible under the said trust agreement only by the joint " consent of the trustees and the consent of the owners of fifty-one or more of the interests of beneficial interest " under the trust.

Therefore, we can see little or no similarity between the manner and form of this trust or ranization and that of a regularly chartered corporation, except possibly that it issued " Interest Receipts " having some of the characteristics of stock certificates, but this factor alone will not " convert it into a corporation," *Extension Oil Co.*, *supra;* " something more is required than the mere issuance of so-called shares." *Myers, Long & Co.*, 14 B. T. A. 460.

It is perfectly possible that under the declaration of trust the trustees may have been " required to receive oil, gas and other products from said oil well," in which event, being compelled to engage in the marketing of said oil, it may have been engaged in a business within the meaning of the decided cases. The fact is, however, that it was never required to do so and we doubt seriously, considering all of the other agreements entered into, that it was ever contemplated that the trust should receive oil and gas and other products from the well or anything else other than the proceeds therefrom. See *C. H. Atherton et al.*, 19 B. T. A. 1172.

A brief résumé of the events leading up to the creation of this trust will bear out the real purpose of its creation and existence. To begin with, Evans procured the lease to the property in his own name, with the understanding that he would drill for oil, he to pay the lessors therefor, as rental, a percentage of the production. Evans himself was apparently without sufficient funds with which to promote the venture alone and he thereupon sought the aid of Wermich and Jackson, who were willing to provide the necessary funds for drilling operations, resulting in the agreement of September 7, 1922, whereby they were to furnish $35,000 and receive a stated percentage of the net proceeds from the operation of the well when completed. Wermich and Jackson, being unable or unwilling to carry the entire financial burden or risk, enlisted the aid of others in providing the sum agreed upon, and for the purpose of setting forth the proportionate interests of those who were to advance the funds, the declaration of trust of September 28, 1922, was entered into. The sole purpose of this trust, therefore, was to provide the funds for drilling one well, and in this particular the instant case is identical with *Extension Oil Co., supra.*

Of course, all of the parties engaged in this venture were primarily interested in the prospective profits to be derived from the

sale of oil and gas, and in that particular all may be said to have had a common interest. But it seems clear to us that the parties in interest, in so far as their endeavors were concerned, were divided into two well defined classes, each functioning independently of the other: (1) those concerned with the drilling and operation of the well and the sale of the production therefrom, and (2) those whose prime function was to finance the venture, receiving as their compensation profits derived from the sale of the products.

As we have already stated, the trustees were never required to receive any oil, the income of the trust being derived solely from oil sold by those in charge of drilling and operating the well. The record shows that the trustees had nothing whatsoever to do with the operation of the well and, furthermore, that they were never even consulted with respect thereto. Nor, indeed, were they ever consulted respecting the sale of the oil or gas therefrom. In fact, the testimony shows that Wermich knew nothing about the contracts entered into for the sale of oil or gas until 30 or 60 days afterward, and it was only through casual inquiry that he learned then.

The trust maintained no office, owned no furniture, and it has never operated any kind of business other than as described. Its only employee during 1923 was a bookkeeper, whose duties were to receive the checks from Evans and disburse specified sums to those beneficially interested and record them in the accounts kept for the purpose. The trustees served without compensation and it appears from the record that their primary function as such was to sign and countersign checks issued to beneficiaries.

In one of the most recent cases promulgated, *Lloyd M. Willis*, *supra*, the purposes of the trust were extremely broad and diversified. There, the Board found that the trustees carried on " an elaborate business," which clearly distinguishes the instant case therefrom without necessity for further consideration.

We are of the opinion, therefore, that the trust here was not of the form and mode of a corporation and that it was not organized to nor did it in fact engage in the conduct of a business, but merely collected the income accruing under the declaration of trust and distributed it to those beneficially interested, and that it is not an " association " and should not be taxed as a corporation under section 230 of the Revenue Act of 1921.

Since the remaining specifications of error are predicated upon our holding the petitioner to be an association, we need not consider them.

*Judgment will be entered under Rule 50*